1
2
3
4
5
6
7
8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   WAYNE WILLIAM WOFFORD,                        No.  2:19-CV-0792-WBS-DMC

12                    Plaintiff,

13        v.                                        FINDINGS AND RECOMMENDATIONS

14   COMMISSIONER OF SOCIAL
     SECURITY,
15
                     Defendant.
16

17

18            Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19   review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20   Pending before the Court are the parties' briefs on the merits, ECF Nos. 17 and 18.

21            The Court reviews the Commissioner's final decision to determine whether it is:

22   (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

23   whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is

24   more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521

25   (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support

26   a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole,

27   including both the evidence that supports and detracts from the Commissioner's conclusion, must

28   be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones

                                                    1

1    v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The Court may not affirm the Commissioner's

2    decision simply by isolating a specific quantum of supporting evidence.  See Hammock v.

3    Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

4    findings, or if there is conflicting evidence supporting a particular finding, the finding of the

5    Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

6    Therefore, where the evidence is susceptible to more than one rational interpretation, one of

7    which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

8    Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

9    standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

10    Cir. 1988).

11          For the reasons discussed below, the court recommends the Commissioner's final

12    decision be affirmed.

13

## I.  THE DISABILITY EVALUATION PROCESS

15          To achieve uniformity of decisions, the Commissioner employs a five-step

16    sequential evaluation process to determine whether a claimant is disabled.  See 20 C.F.R.

17    §§ 404.1520 (a)-(f) and 416.920(a)-(f).   The sequential evaluation proceeds as follows:

| | |
|---|---|
| Step 1 | Determination whether the claimant is engaged in substantial gainful activity; if so, the claimant is presumed not disabled and the claim is denied; |
| Step 2 | If the claimant is not engaged in substantial gainful activity, determination whether the claimant has a severe impairment; if not, the claimant is presumed not disabled and the claim is denied; |
| Step 3 | If the claimant has one or more severe impairments, determination whether any such severe impairment meets or medically equals an impairment listed in the regulations; if the claimant has such an impairment, the claimant is presumed disabled and the claim is granted; |
| Step 4 | If the claimant's impairment is not listed in the regulations, determination whether the impairment prevents the claimant from performing past work in light of the claimant's residual functional capacity; if not, the claimant is presumed not disabled and the claim is denied; |

| | | |
|---|---|---|
| Step 5 | | If the impairment prevents the claimant from performing past work, determination whether, in light of the claimant's residual functional capacity, the claimant can engage in other types of substantial gainful work that exist in the national economy; if so, the claimant is not disabled and the claim is denied. |

See 20 C.F.R. §§ 404.1520 (a)-(f) and 416.920(a)-(f).

To qualify for benefits, the claimant must establish the inability to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted, or can be expected to last, a continuous period of not less than 12 months.  See 42 U.S.C. § 1382c(a)(3)(A).  The claimant must provide evidence of a physical or mental impairment of such severity the claimant is unable to engage in previous work and cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  See Quang Van Han v. Bower, 882 F.2d 1453, 1456 (9th Cir. 1989).  The claimant has the initial burden of proving the existence of a disability.  See Terry v. Sullivan, 903 F.2d 1273, 1275 (9th Cir. 1990).

The claimant establishes a prima facie case by showing that a physical or mental impairment prevents the claimant from engaging in previous work.  See Gallant v. Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984); 20 C.F.R. §§ 404.1520(f) and 416.920(f).  If the claimant establishes a prima facie case, the burden then shifts to the Commissioner to show the claimant can perform other work existing in the national economy.  See Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988); Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); Hammock v. Bowen, 867 F.2d 1209, 1212-1213 (9th Cir. 1989).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## II.  THE COMMISSIONER'S FINDINGS

Plaintiff applied for social security benefits on March 23, 2015.  See CAR 13.[1]  In the application, plaintiff claims disability began on November 3, 2014.  See id.   Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on August 16, 2017, before Administrative Law Judge (ALJ) Ruxana Meyer.  In a May 2, 2018, decision, the ALJ concluded plaintiff is not disabled based on the following relevant findings:

1.   The claimant has the following severe impairment(s): blindness and exotropia of the left eye, headaches, a history of polysubstance abuse, and depression;

2.   The claimant does not have an impairment or combination of impairments that meets or medically equals an impairment listed in the regulations;

3.   The claimant has the following residual functional capacity: a full range of work at all exertional levels; the claimant can perform frequent climbing, balancing, kneeling, and crawling; he can occasionally negotiate uneven terrain; he can do work that does not involve ladders, working at heights, moving machinery, or proximity to open flames; he is capable of performing simple repetitive tasks involving occasional interaction with coworkers and the general public; he is able to perform work tasks that do not require fine visual discrimination or more than occasional near acuity, far acuity, depth perception, and field of vision with the left eye; he can handle and work with large objects such as boxes of tools like brooms, shovels, and sledgehammers; the claimant should avoid ordinary hazards such as boxes on the floor, doors ajar, and approaching people or objects;

4.   Considering the claimant's age, education, work experience, residual functional capacity, and vocational expert testimony, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

See id. at 16-25.

After the Appeals Council declined review on March 1, 2019, this appeal followed.

///

///

///

---

[1]    Citations are the to the Certified Administrative Record (CAR) lodged on September 9, 2019, see ECF No. 12.

### III.  DISCUSSION

In his opening brief, Plaintiff argues: (1) the ALJ's findings regarding limitations cause by Plaintiff's visual impairment are not supported by any medical opinion; (2) the ALJ's mental residual functional capacity assessment is also unsupported; (3) the ALJ erred in rejecting Plaintiff's testimony as not credible; and (4) the ALJ failed to provide sufficient reasons for rejecting lay witness evidence.

### A.     Medical Opinions

Plaintiff's first two arguments are related in that they touch on the ALJ's evaluation of the medical opinion evidence.  In his first claim of error, Plaintiff asserts the ALJ's physical residual functional capacity assessment is not based on any medical evidence and, as such, must represent the ALJ's lay opinion.  See ECF No. 17, pg. 11.  In his second claim of error, Plaintiff asserts the ALJ's mental residual functional capacity assessment is flawed because the ALJ failed to properly account for opinions rendered by Dr. Izzi, the agency examining psychologist, and his treating therapist.  See id. at 14.

"The ALJ must consider all medical opinion evidence."  Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing 20 C.F.R. § 404.1527(b)).  The ALJ errs by not explicitly rejecting a medical opinion.  See Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014).  The ALJ also errs by failing to set forth sufficient reasons for crediting one medical opinion over another.  See id.

Under the regulations, only "licensed physicians and certain qualified specialists" are considered acceptable medical sources.  20 C.F.R. § 404.1513(a); see also Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012).  Where the acceptable medical source opinion is based on an examination, the ". . . physician's opinion alone constitutes substantial evidence, because it rests on his own independent examination of the claimant."  Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  The opinions of non-examining professionals may also constitute substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.  See Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002).  Social workers are not considered an acceptable medical source.  See Turner v. Comm'r of Soc. Sec.

5

1    Admin., 613 F.3d 1217, 1223-24 (9th Cir. 2010).  Nurse practitioners and physician assistants

2    also are not acceptable medical sources.  See Dale v. Colvin, 823 F.3d 941, 943 (9th Cir. 2016).

3    Opinions from "other sources" such as nurse practitioners, physician assistants, and social

4    workers may be discounted provided the ALJ provides reasons germane to each source for doing

5    so.  See Popa v. Berryhill, 872 F.3d 901, 906 (9th Cir. 2017), but see Revels v. Berryhill, 874

6    F.3d 648, 655 (9th Cir. 2017) (quoting 20 C.F.R. § 404.1527(f)(1) and describing circumstance

7    when opinions from "other sources" may be considered acceptable medical opinions).

8           The weight given to medical opinions depends in part on whether they are

9    proffered by treating, examining, or non-examining professionals.  See Lester v. Chater, 81 F.3d

10   821, 830-31 (9th Cir. 1995).  Ordinarily, more weight is given to the opinion of a treating

11   professional, who has a greater opportunity to know and observe the patient as an individual, than

12   the opinion of a non-treating professional.  See id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th

13   Cir. 1996); Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The least weight is given to the

14   opinion of a non-examining professional.  See Pitzer v. Sullivan, 908 F.2d 502, 506 & n.4 (9th

15   Cir. 1990).

16          In addition to considering its source, to evaluate whether the Commissioner

17   properly rejected a medical opinion the court considers whether: (1) contradictory opinions are in

18   the record; and (2) clinical findings support the opinions.  The Commissioner may reject an

19   uncontradicted opinion of a treating or examining medical professional only for "clear and

20   convincing" reasons supported by substantial evidence in the record.  See Lester, 81 F.3d at 831.

21   While a treating professional's opinion generally is accorded superior weight, if it is contradicted

22   by an examining professional's opinion which is supported by different independent clinical

23   findings, the Commissioner may resolve the conflict.  See Andrews v. Shalala, 53 F.3d 1035,

24   1041 (9th Cir. 1995).

25          A contradicted opinion of a treating or examining professional may be rejected

26   only for "specific and legitimate" reasons supported by substantial evidence.  See Lester, 81 F.3d

27   at 830.  This test is met if the Commissioner sets out a detailed and thorough summary of the

28   facts and conflicting clinical evidence, states her interpretation of the evidence, and makes a

finding.  See Magallanes v. Bowen, 881 F.2d 747, 751-55 (9th Cir. 1989).  Absent specific and

legitimate reasons, the Commissioner must defer to the opinion of a treating or examining

professional.  See Lester, 81 F.3d at 830-31.  The opinion of a non-examining professional,

without other evidence, is insufficient to reject the opinion of a treating or examining

professional.  See id. at 831.  In any event, the Commissioner need not give weight to any

conclusory opinion supported by minimal clinical findings.  See Meanel v. Apfel, 172 F.3d 1111,

1113 (9th Cir. 1999) (rejecting treating physician's conclusory, minimally supported opinion); see

also Magallanes, 881 F.2d at 751.

At Step 4, the ALJ evaluated the medical opinions of record.  See CAR 21.  In

particular, the ALJ considered reports prepared by Drs. Fabella and Izzi, who conducted

examinations at the request of the agency, and four agency reviewing doctors.  See id.

As to Drs. Fabella and Izzi, the ALJ stated:

> . . .[c]onsultative examiner, Emmanuel Fabella, M.D., performed a
> physical examination on the claimant in July 2015.  Following the
> examination, Dr. Fabella diagnosed the claimant with headaches and
> visual deficits with mild error of retraction, as well as mild visual field
> defect to the left of the midline.  He opined that as a result of these
> impairments, the claimant retains the ability to frequently climb, balance,
> kneel, or crawl.  He assessed that the claimant is also able to occasionally
> walk in uneven terrain, but should avoid ladders and working at heights or
> moving machinery (Exhibit 2F).
>
> In August 2015, consultative examiner, Roger Izzi, Ph.D., performed a
> psychological evaluation on the claimant. Afterwards, he diagnosed the
> claimant with major depressive disorder with anxious distress.  Dr. Izzi
> opined that due to this condition, the claimant's ability to get along with
> peers or supervisors is moderately limited.  He further indicated that the
> claimant's significant fluctuation of mood also limits the claimant's ability
> to perform complex tasks on a consistent basis for over an eight-hour
> period (Exhibit 3F).  The undersigned affords great weight to the opinion
> of both Dr. Fabella and Dr. Izzi.  Specifically, their opinions are consistent
> with and well supported by their own examinations of the claimant, as
> well as the treatment notes in the record.

CAR 21.

As to the agency reviewing doctors, the ALJ stated:

> Two medical state agency consultants reviewed the claimant's medical
> evidence of record in September 2015 and January 2016.  Following their
> review, both doctors opined that the claimant has mild restrictions in
> activities of daily living, mild difficulties with social functioning, and mild
> difficulties with centration, persistence, or pace (Exhibits 1A, 2A, 5A,

6A).  The undersigned acknowledges that, in forming their opinions, the two reviewing doctors evaluated the claimant's impairments using the B criteria set forth in a previous version of the medical listings.  Therefore, the undersigned has addressed their opinions within the context of the updated listings.

Another two agency consultants reviewed the claimant's medical evidence of record in August 2015 and January 2016.  Both reviewing doctors opined that the claimant's physical impairments are non-severe (Exhibits 1A, 2A, 5A, 6A).  The undersigned affords little weigh to the opinions of all four above-mentioned reviewing doctors because their assessments contrast[] sharply with the other evidence of record, rendering them less persuasive.

CAR 21.

Finally, in addressing the medical opinions, the ALJ commented on a Global Assessment of Functioning score assessed by a treating source:

The undersigned notes that a Global Assessment of Functioning (GAF) score was assigned to the claimant.  This claimant was assigned a GAF score of 45 (Exhibit 7F).  However, the undersigned acknowledges that GAF scores are subjectively assessed scores that often contain information on financial or relationship stressors, not necessarily related to work ability.  In fact, single GAF scores reveal only snapshots of impaired or improved behavior and are simply a prediction of the claimant's level of function at that moment in time.  GAF scores can also vary wildly from day-to-day and among practitioners.  It is notable that the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-V) no longer utilize[s] GAF scores because of the subjective nature of each score.  Thus, the undersigned gives more weight to the objective details and chronology of the record, which more accurately describes the claimant's impairments and limitations.  For these reasons, the undersigned gives minimal weight to the GAF scores documented in the treatment records.

CAR 21.

1.     Visual Impairment

Plaintiff argues:

Briefly, Plaintiff's left eye was knocked out of its socket when he was hit by a car at age two (Tr. 353). He underwent eye surgery, but his left eye remained laterally deviated (Tr. 353). Plaintiff reported his vision had worsened and he had "constant" double vision, cloudiness and difficulty focusing (Tr. 48-51). At Plaintiff's hearing the ALJ indicated she would send Plaintiff to an ophthalmological CE (consultative examiner) so the ALJ could "properly form an RFC" (Tr. 63-64).
The ophthalmologist's examination revealed the uncorrected visual acuity in Plaintiff's right eye was 20/40 and in his left eye it was 20/200 (Tr. 421). The best corrected visual acuity in Plaintiff's right eye was 20/30 and in his left eye it was 20/200 (Tr. 421). There was presbyopia (farsightedness) in his right eye (Tr. 421). Visual fields were constricted to 40 to 60 degrees in Plaintiff's right eye and 30 to 40 degrees in his left eye

(Tr. 421). A normal visual field is 50 to 60. (footnote omitted). The ophthalmologist diagnosed left eye exotropia (outward deviating eye) and amblyopia (reduced vision caused by exotropia). (footnote omitted). (Tr. 421).

The ophthalmologist did not provide a medical source statement as to the functional limitations caused by Plaintiff's visual impairment (Tr. 421). A medical source statement is the medical opinion of an acceptable medical source about what an individual can still do in spite of his severe impairments, focusing on the individual's ability to perform work-related activities on a sustained basis. Social Security Ruling (SSR) 96-5p ("Medical source statements are medical opinions submitted by acceptable medical sources, including treating sources and consultative examiners, about what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis") (footnote omitted). Nor apparently was the ophthalmologist's report reviewed by an ophthalmologist or other medical expert to obtain an opinion of Plaintiff's visual functioning. Perhaps coincidentally, the ALJ's RFC finding is substantially the same as the limitations the ALJ presented to the VE in her relevant hypothetical questioning at Plaintiff's hearing (Tr. 54-57). However, Plaintiff's hearing was held before he was examined by the consultative examining ophthalmologist (Tr. 63). This suggests the ALJ's decision may have been results-driven.

The ALJ's visual RFC finding is not supported by any medical opinion of record, not even the opinions of the state agency physicians (Tr. 66-113). Thus, the ALJ's findings regarding Plaintiff's visual limitations must be based on the ALJ's lay opinion, which does not constitute substantial evidence sufficient to support her decision. There is no medical support for the ALJ's finding that Plaintiff could occasionally (up to 1/3 of the workday) use his left eye for near acuity, far acuity, depth perception or field of vision, as found by the ALJ (Tr. 19). Indeed, the ALJ did not explain how occasional use of Plaintiff's left eye for these purposes would work on a practical basis in a work setting (Tr. 19). The ALJ's conclusions are far from intuitive. Further, the ALJ's RFC finding does not account for limitations caused by such things as Plaintiff's eye strain, difficulty focusing and constant double vision.

Because the Commissioner's "path cannot be reasonably discerned," the ALJ's decision regarding Plaintiff's visual limitations should be reversed because it cannot be subjected to meaningful judicial review. Treichler, 775 F.3d at 1103. On remand, the ALJ should be instructed to obtain an ophthalmologist's opinion as to what work activities Plaintiff can perform in spite of his visual impairment.

ECF No. 17, pgs12-13.

Here, the ALJ's residual functional capacity finding limited Plaintiff to jobs "that do not require fine visual discrimination or more than occasional near acuity, far acuity, depth perception, and field of vision with the left eye." CAR 19. The record reflects that Plaintiff was seen by Syed S. Hasnain, M.D., an agency examining ophthalmologist on September 12, 2017. See id. at 421. As Plaintiff admits, Dr. Hasnain did not provide any assessment of functional

9

1    limitations associated with Plaintiff's left eye.  See id.  Dr. Hasnain's report reflects that

2    Plaintiff's right eye is essentially normal with corrected vision at 20/30.  Pressure in both eyes

3    was normal.  See id.  Fundus exam was normal in each eye.  See id.  Visual fields were

4    constricted 40 to 60 degrees in the right eye and 30 to 40 degrees in the left eye.  See id.

5              The only doctor to express an opinion regarding Plaintiff's vision is Dr. Fabella,

6    who opined Plaintiff has a "mild error of retraction" and "mild visual field defect to the left of

7    midline."  As with Dr. Hasnain, Dr. Fabella did not assess any work-related limitations associated

8    with these mild visual impairments.  The ALJ accepted Dr. Fabella's conclusions and Plaintiff

9    does not challenge this analysis.

10             Moreover, as the ALJ noted, the first two agency consultative reviewing doctors

11   found only mild limitations but based their opinions on outdated regulations.  The second two

12   agency consultative reviewing doctors opined Plaintiff's impairments were non-severe.  The ALJ

13   was entitled to resolve the conflict between the reviewing doctors' opinions of no severe

14   impairments and Dr. Fabella's opinion that Plaintiff's visual impairments were mild.  The ALJ

15   did so by accounting for visual limitations in the residual functional capacity assessment.

16             Plaintiff has not met his burden of producing objective medical evidence showing

17   a greater degree of work-related limitation than that assessed by the ALJ.  To the extent Plaintiff

18   asserts limitations due to double vision caused by his left eye impairment, Plaintiff has not

19   provided any medical opinions to support the assertion, and neither Dr. Fabella nor Dr. Hasnain

20   noted limitations due to double vision.  Additionally, there is no evidence Plaintiff ever sought

21   further treatment for double vision associated with amblyopia of the left eye, such as corrective

22   eye alignment surgery.

23             Finally, as Defendant notes, Plaintiff's left eye impairment has existed since he

24   was a child, yet Plaintiff says he only became disabled as an adult in November 2014.  Before

25   that time, Plaintiff engaged in substantial gainful activity for many years.  See CAR 195-96.

26   Plaintiff stopped working due to a layoff.  See id. at 360.  The Court agrees with Defendant that

27   Plaintiff's demonstrated ability to work even with his left eye impairment supports the ALJ's

28   residual functional capacity finding.  See Gregory v. Bowen, 844 F.2d 664, 667 (9th Cir. 1988);

1   Osenbrock v. Apfel, 240 F.3d 1157, 1165 (9th Cir. 2001).

2           For the foregoing reasons, the Court finds the ALJ's analysis and residual

3   functional capacity assessment concerning Plaintiff's left eye impairment is supported by

4   substantial evidence.

5           2.     Mental Impairment

6           According to Plaintiff, the ALJ erred with respect to evaluation of Dr. Izzi's

7   opinions as well as evaluation of the GAF score assessed by Plaintiff's treating source:

8           The ALJ found Plaintiff had the mental capacity to perform simple
    repetitive tasks requiring occasional interaction with co-workers and the

9   general public (Tr. 19). In so finding, the ALJ failed to reject limitations
    opined by the consultative examining psychologist and erroneously

10  rejected the opinion of Plaintiff's therapist.

11  ECF No. 17, pg. 14.

12          a.     Dr. Izzi's Opinions

13          As to Dr. Izzi, Plaintiff argues:

14          In this case, the ALJ indicated she gave "great weight" to the
    opinion of Dr. Izzi, the psychologist who examined Plaintiff at the request

15  of the state agency (Tr. 21). Dr. Izzi opined Plaintiff could perform simple
    repetitive type tasks and his abilities to get along with peers or supervisors

16  in a work-like setting were moderately limited by his mood disorder (Tr.
    362).

17          The ALJ accounted for Dr. Izzi' opinion of Plaintiff's moderately
    limited ability to get along with peers by including a limitation to

18  occasional interaction with co-workers (Tr. 19). However, the ALJ did not
    account for Dr. Izzi's opinion of Plaintiff's moderately limited ability to

19  get along with supervisors in his RFC finding - nor did she give any
    reasons for rejecting it (Tr. 19, 21).

20          This omission is material. The Commissioner specifically
    recognizes that limitations in the amount of supervision a person can

21  tolerate constitutes an important part of the rating of the ability to perform
    the social requirements of work activity. 20 CFR §§ 404.1520a(c)(2),

22  416.920a(c)(2). The ability to respond appropriately to supervision and
    coworkers is at the core of a residual functional capacity assessment. 20

23  CFR §§ 404.1545(c), 416.945(c). Thus, any limitation in a claimant's
    ability to get along with supervisors should be included in a decision's

24  RFC finding. The ALJ's failure to do so is a legal error.
            Therefore, on remand the ALJ should either accept or give legally

25  adequate reasons for rejecting Dr. Izzi's opinion, in whole or in part.

26  ECF No. 17, pgs. 14-15.

27  / / /

28  / / /

1     Dr. Izzi prepared a report following his psychological evaluation of Plaintiff on

2   August 4, 2015.  See CAR 360-63.  Dr. Izzi concluded:

3         The claimant presented as a 44-year-old male.  He reported that he is
          presently working.  He last worked full time at Wal-Mart.  After working
4         there for six years, he reported that there was a layoff.  He then began
          collecting unemployment.
5
          His performance on the present mental status examination seems
6         satisfactory.

7         Clinical interview indicates that the claimant is not having any difficulties
          caring for his basic hygiene.  The present evaluation suggests that the
8         claimant does appear capable of performing a simple and repetitive type
          task on a consistent basis over an eight-hour period.  His ability to get
9         along with peers or be supervised in a work-like setting would be
          moderately limited by his mood disorder.  The claimant's mood disorder
10        will fluctuate.  Any significant fluctuation of mood would limit the
          claimant's ability to perform a complex task on a consistent basis over an
11        eight-hour period.  On a purely psychological basis, the claimant appears
          capable of responding to usual work session situations regarding
12        attendance and safety issues.  On a purely psychological basis, the
          claimant appears capable of dealing with changes in a routine work
13        setting.

14        Id. at 362.

15   The ALJ largely accepted Dr. Izzi's conclusions and adopted the doctor's limitations in the

16   residual functional capacity assessment.  Specifically, the ALJ limited Plaintiff to "simple

17   repetitive tasks involving occasional interaction with coworkers and the general public."  CAR

18   19.

19        Plaintiff faults the ALJ for not accounting for Dr. Izzi's opinion that Plaintiff is

20   moderately limited in his "ability to. . . be supervised."  A similar argument concerning opinions

21   rendered by Dr. Izzi was evaluated in Shaibi v. Berryhill, 883 F.3d 1102 (9th Cir. 2017).  In that

22   case, Dr. Izzi examined Shaibi and rendered opinions on mental functional abilities.  See id. at

23   1104.  Dr. Izzi opined that Shaibi was "moderately limited" in the ability to get along with peers

24   and supervisors due a mood disorder.  See id.  Shaibe made the same argument as Plaintiff makes

25   here – that the ALJ erred in not including specific limitations to interactions with supervisors in

26   the residual functional capacity assessment.  See id. at 1106-07.  The Ninth Circuit rejected this

27   / / /

28   / / /

                                              12

1   argument.  See id. at 1107.  The court held:

2          . . .Ultimately, the ALJ found that Shaibi was "limited to simple routine
3          tasks in a non-public setting, with occasional interaction with coworkers."
           The ALJ evidently contemplated that Shaibi's social limitations were
           significant enough that he was incapable of frequent or sustained
4          interactions with coworkers, but not sufficiently debilitating that Shaibi
           could *never* interact with colleagues or supervisors.  That conclusion is
5          consistent with Dr. Izzi's opinion that Shaibi's social limitations were
           "moderate," rather than mild or marked.

6          Id.

7

8          Following the court's rationale in Shaibi, this Court concludes that the ALJ's

9   evaluation of Dr. Izzi's opinions is consistent with the residual functional capacity finding.  In

10  particular, as in Shaibi, the ALJ's inclusion of limitations on social interactions in the workplace

11  account for Dr. Izzi's opinion that Plaintiff is moderately limited in various social interactions,

12  including with co-workers and supervisors.

13                    b.        GAF Score Assessed by Treating Source

14         As to the GAF score assessed by Plaintiff's treating source, Plaintiff contends:

15         Further, the ALJ erred when rejecting the GAF score of 45
           assigned by Plaintiff's therapist (Tr. 21). A GAF score is a psychiatric
16         opinion and, "As with other opinion evidence, the extent to which an
           adjudicator can rely on the GAF rating as a measure of impairment
17         severity and mental functioning depends on whether the GAF rating is
           consistent with other evidence, how familiar the rater is with the claimant,
18         and the rater's expertise." Administrative Message (AM) -13066 (effective
           07/22/13)6; see Garrison, 759 F.3d at 1003 n.4 ("A GAF score is a rough
19         estimate of an individual's psychological, social, and occupational
           functioning used to reflect the individual's need for treatment [that] "may
20         be a useful measurement [regarding whether a] "person's mental
           impairments rise to the level of disability") (quoting Vargas v. Lambert,
21         159 F.3d 1161, 1164 n. 2 (9th Cir. 1998)). Therefore, an ALJ is required to
           give legally adequate reasons for rejecting a claimant's GAF scores.
22         Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996) (ALJ must give clear
           and convincing reasons for rejecting the uncontroverted opinion of a
23         treating or examining physicians and specific and legitimate reasons for
           rejecting the controverted opinion of a treating or examining physician).
24         In this case, Plaintiff was assigned a GAF score of 55 in April
           2015, which indicated moderate limitations7 (Tr. 345). This corroborates,
25         at least in part, the opinion of Dr. Izzi, who examined Plaintiff in August
           2015 and opined he had moderate social limitations (Tr. 362). However,
26         by December 2015, Plaintiff's depression had increased and he was
           experiencing discouragement, resignation and he did not go anywhere
27         anymore (Tr. 389). In February 2016, Plaintiff's therapist assigned a GAF
           score of 45, indicating a serious impairment8, and referred Plaintiff for
28         medication management based on his severe Major Depressive Disorder

                                         13

1    with psychotic features, depression, anhedonia, auditory hallucinations,
     insomnia, feelings of worthlessness and thoughts about death (Tr. 416).
2    Thus, the GAF score of 45 addressed by the ALJ showed a worsening of
     Plaintiff's impairment between April 2015 and January 2016.
3            When rejecting the January 2016 opinion of Plaintiff's therapist
     (GAF score of 45), the ALJ indicated she was giving more weight "to the
4    objective details and chronology of the record, which more accurately
     describes the claimant's impairments and limitations" (Tr. 21). However,
5    the ALJ did not describe these "objective details and chronology of the
     record" (Tr. 21). In any event, this finding is contradicted by a fair reading
6    of the record. Subsequent clinical findings indicate Plaintiff continued to
     be seriously impaired after his therapist offered his opinion in January
7    2016. For example, in May 2016, Plaintiff's therapist observed he was
     easily distracted and his thoughts frequently became tangential (Tr. 409);
8    in June 2016, Plaintiff's thoughts and speech were more rapid and
     dysregulated and he had difficulties distinguishing the difference between
9    his emotions and his thoughts (Tr. 406); and in July 2017, Plaintiff was
     depressed, discouraged and mildly unkempt and had not planted a garden
10   that year (Tr. 417). These "objective details," not addressed by the ALJ,
     accurately reflected Plaintiff's serious impairments and limitations and
11   show his mental functioning actually worsened after Dr. Izzi expressed his
     opinion.
12           Thus, the ALJ's failure to give specific and legitimate reasons
     rejecting the opinion of Plaintiff's therapist that Plaintiff was seriously
13   impaired is another error that warrants remand.

14   ECF No. 17, pgs. 15-16.

15           Regarding the one-time GAF score of 45 assessed by a treating source, the ALJ

16   gave this evidence minimal weight.  See CAR 21, noting,  the ALJ noted that GAF scores are

17   necessarily subjective and represent only a snapshot of someone's condition at that moment in

18   time.  See id.  The ALJ also observed that GAF scores are no longer relevant under the current

19   DSM-V for these reasons.  As Defendant notes, the Ninth Circuit has affirmed findings of non-

20   disability in cases where claimants have had GAF scores in the 40s.  See Bayliss v. Barnhart, 427

21   F.3d 1211, 1217 n.3 (9th Cir. 2005); Morgan v. Comm'r of SSA, 169 F.3d 595, 598 n.1 (9th Cir.

22   1999).

23           The Court finds no error in the ALJ's analysis of a one-time GAF score of 45

24   assessed by Plaintiff's treating source.

25   / / /

26   / / /

27   / / /

28   / / /

14

1    **B.    Credibility**

2         Plaintiff argues the ALJ's credibility analysis is flawed because it "appears to be

3    based largely on the ALJ's flawed interpretation of the medial evidence (addressed above)."  ECF

4    No. 17, pg. 17.  Plaintiff also contends the ALJ erred in citing his daily activities.  See id.

5         The Commissioner determines whether a disability applicant is credible, and the

6    court defers to the Commissioner's discretion if the Commissioner used the proper process and

7    provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

8    credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

9    F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d

10   821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible

11   and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative

12   evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not

13   credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d

14   1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007),

15   and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

16        If there is objective medical evidence of an underlying impairment, the

17   Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely

18   because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d

19   341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

20            The claimant need not produce objective medical evidence of the
              [symptom] itself, or the severity thereof.  Nor must the claimant produce
21            objective medical evidence of the causal relationship between the
              medically determinable impairment and the symptom.  By requiring that
22            the medical impairment "could reasonably be expected to produce" pain or
              another symptom, the Cotton test requires only that the causal relationship
23            be a reasonable inference, not a medically proven phenomenon.

24            80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in
              Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).
25

26   / / /

27   / / /

28   / / /

15

1    The Commissioner may, however, consider the nature of the symptoms alleged,

2    including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell,

3    947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the

4    claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent

5    testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

6    prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5)

7    physician and third-party testimony about the nature, severity, and effect of symptoms.  See

8    Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the

9    claimant cooperated during physical examinations or provided conflicting statements concerning

10   drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the

11   claimant testifies as to symptoms greater than would normally be produced by a given

12   impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See

13   Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

14   Regarding reliance on a claimant's daily activities to find testimony of disabling

15   pain not credible, the Social Security Act does not require that disability claimants be utterly

16   incapacitated.  See Fair v. Bowen, 885 F.2d 597, 602 (9th Cir. 1989).  The Ninth Circuit has

17   repeatedly held that the ". . . mere fact that a plaintiff has carried out certain daily activities . . .

18   does not . . .[necessarily] detract from her credibility as to her overall disability."  See Orn v.

19   Astrue, 495 F.3d 625, 639 (9th Cir. 2007) (quoting Vertigan v. Heller, 260 F.3d 1044, 1050 (9th

20   Cir. 2001)); see also Howard v. Heckler, 782 F.2d 1484, 1488 (9th Cir. 1986) (observing that a

21   claim of pain-induced disability is not necessarily gainsaid by a capacity to engage in periodic

22   restricted travel); Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir. 1984) (concluding that the

23   claimant was entitled to benefits based on constant leg and back pain despite the claimant's

24   ability to cook meals and wash dishes); Fair, 885 F.2d at 603 (observing that "many home

25   activities are not easily transferable to what may be the more grueling environment of the

26   workplace, where it might be impossible to periodically rest or take medication").   Daily

27   activities must be such that they show that the claimant is ". . .able to spend a substantial part of

28   his day engaged in pursuits involving the performance of physical functions that are transferable

16

to a work setting." <u>Fair</u>, 885 F.2d at 603.  The ALJ must make specific findings in this regard before relying on daily activities to find a claimant's pain testimony not credible.  See <u>Burch v. Barnhart</u>, 400 F.3d 676, 681 (9th Cir. 2005).

At Step 4, the ALJ evaluated the credibility of Plaintiff's statements and testimony.  <u>See</u> CAR 19-20.  The ALJ stated:

> . . .In his disability report, the claimant alleged an inability to work due to mental issues, vision problems, and headaches (Exhibit 5E).  In November 2015, the claimant reported a decrease in his vision, an increase in his psychological symptoms, and an increase in his psychiatric medication (Exhibit 10E).  Specifically, he states that his blurry vision causes him to see shadows or people that are not there, and his medication causes side effects such as drowsiness (Exhibits 10E, 12E).  The claimant reported that the worsening of his symptoms makes it harder for him to leave his home (Exhibit 12E).  At the hearing, the claimant testified that he is currently working eight hours a week as a sign holder but stated that even this is becoming too difficult for him to manage (Testimony).

> After careful consideration of the evidence, the undersigned finds that the claimant's medially determinable impairments could reasonably be expected to cause the alleged symptoms, however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

> For example, the medical evidence confirms that the claimant has been experiencing left eye issues since the age of two when a car struck him.  According to the records, the claimant underwent left eye surgery to resolve a dislodged left eyeball.  Since then, the claimant's left eye has been laterally deviated causing blurry vision and a blind spot on his left peripheral vision.  Upon examination, the claimant's left eye is deviated at 45 degrees to the left with both eyes are open (Exhibit 2F).  In addition, the claimant's visual acuity with eyeglasses was found to be 20/30 in the right eye, but 20/200 in the left eye (Exhibit 9F).  As such, the undersigned has taken the claimant's blindness and exotropia of the left eye into consideration when determining the above-referenced residual functional capacity.

> The medical evidence also confirms that the claimant experiences daily tension headaches that are likely stress-related (Exhibit 2F).  However, the treatment records indicate that the claimant's headaches are intermittent and usually only last about 15 minutes before going away on their own (Exhibits 5F, 10F).  Furthermore, the claimant informed his treating providers that he does not take pain medication and has not seen a doctor in over 25 years (Exhibits 1F, 5F, 10F).  This statement is confirmed by the lack of medical records in the claimant's file pertaining to any physical health impairments and/or treatment.  Therefore, the undersigned finds that the claimant's lack of more aggressive treatment, surgical intervention, or even a referral to a specialist suggests the claimant's symptoms and limitations are not as severe as alleged.

* * *

The medical evidence shows that the claimant has depression, precipitated by the March 2015 death of his girlfriend (Exhibit 3F). Specifically, the medical records describe a depressed mood, worried thoughts, occasionally suicidal ideations, delusions, and auditory and visual hallucinations (Exhibit 1F). In fact, the claimant reported having conversations with people who are not there (Exhibit 5F). However, by June 2015, the claimant informed his treating provider that his individual and group therapy were helping lower the intensity of his grief (Exhibit 1F). Bereavement issues aside, the limitations associated with the claimant's depression do not warrant the level of limitation alleged owing to such impairment.

Although the claimant's activities of daily living illustrate some functional deficits, they are not to the level of severity related by the claimant. For example, despite his impairments, the claimant continues to engage in a somewhat normal level of daily activity and interaction. Specifically, the claimant admitted activities of daily living including living alone, working part-time, managing his own finances, gardening, conducting yard sales, playing poker, and tending to his own personal needs (Exhibits 3F, 6F, 7F, 10F, Testimony). Furthermore, throughout the medical records, the claimant is described as well nourished, well developed, alert, oriented, awake, and in no acute distress (Exhibits 2F, 3F, 5F, 10F). This indicates to the undersigned that the claimant is more able-bodied than he alleged.

CAR 19-20.

In his brief, Plaintiff first contends the ALJ's analysis is based on a faulty analysis of the medical evidence. See ECF No. 17, pg. 17. Second, Plaintiff argues reversal is warranted because the ALJ relied solely on a lack of objective support. See id. Third, Plaintiff contends the ALJ improperly relied on Plaintiff's daily activities. See id. at 17-19. According to Plaintiff:

The ALJ's rejection of Plaintiff's testimony appears to be based above largely on the ALJ's flawed interpretation the medical evidence (addressed) (Tr. 20-22). Further, an ALJ's rejecting of a claimant's subjective complaints will not survive judicial review if such rejection is based only on lack of support in his medical records. See Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997) (a credibility finding cannot be premised wholly on a lack of medical support for the severity of his symptoms).

The ALJ also rejected Plaintiff's testimony because his "somewhat normal level of daily activity and interaction" indicated he was "more able-bodied than he alleged" (Tr. 19-21). This reasoning should fail judicial review because the ALJ was required to consider "the complete picture" of Plaintiff's daily functioning, including the help and support he received. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D)(3)(a) ("We will consider the complete picture of your daily functioning, including the kinds, extent, and frequency of help your receive [ ]"). The fact that a claimant "performs routine activities without help or support" does not necessarily mean claimant does not have a disabling mental disorder. Id.

18

These activities may include taking care of personal needs, cooking, shopping, paying bills, living alone and driving a car. Id. ("For example, you may be able to take care of your personal needs, cook, shop, pay your bills, live by yourself, and drive a car."). Further, the Commissioner's regulations recognize that a claimant may receive various kinds of help that enable him to do many things that, because of a mental disorder, claimant may not be able to do independently and further provides:

> Your daily functioning may depend on the special contexts in which you function. For example, you may spend your time among only familiar people or surroundings, in a simple and steady routine or an unchanging environment, or in a highly structured setting. However, this does not necessarily show how you would function in a work setting on a sustained basis, throughout a normal workday or workweek.

> 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D)(3)(b).

In this case, the activities cited by the ALJ were "living alone, working part time, managing his own finances, gardening, conducting yard sales, playing poker, and tending to his own personal needs" (Tr. 20). However, the evidence of record, including the exhibits cited by the ALJ, shows Plaintiff was almost a recluse - he lived alone in a trailer on his parent's property, he rarely left home and, when he did, he only went to the store and to mental health appointments (Tr. 43, 267, 360, 389). His mother drove him to his appointments (Tr. 267). (The exhibits cited by the ALJ do not indicate Plaintiff played cards or conducted yard sales (Tr. 20)). He had lost interest in activities he previously enjoyed (Tr. 387). He did not see friends or family (other than his parents), did not belong to any clubs, groups or organizations and did not attend religious services (Tr. 360). He worked part-time waving a sign for two days a week, four hours a day (Tr. 39). Even this limited type of work was a "struggle" for him to complete (Tr. 38-39). These extremely limited activities indicate an individual who can function only in the protected environment ("special contexts") he created for himself. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D)(3)(b). Therefore, Plaintiff's testimony is not contradicted by his daily activities nor do Plaintiff's activities show he could perform sustained work in a competitive work environment.

ECF No. 17, pgs. 17-19.

1.    Interpretation of Medical Evidence

Plaintiff states that the ALJ's credibility analysis is insufficient because it is based on a "flawed interpretation of the medical evidence (addressed above)." Id. at 17. Plaintiff cites "Tr. 20-22." Id. This citation references the portion of the hearing decision at CAR 20-22 in which the ALJ discusses both the objective medical findings and the various medical opinions of record. In this portion of the hearing decision, the ALJ discusses the following medical evidence:

1   (1) the objective medical evidence related to Plaintiff's left eye; (2) the objective medical

2   evidence related to headaches; (3) the objective evidence related to Plaintiff's mental impairment;

3   (4) the opinions rendered by Drs. Izzi and Fabella; (5) the GAF score assessed by Plaintiff's

4   treating source; and (6) the opinions of the agency consultative reviewing doctors.  See CAR 20-

5   22.

6            The ALJ's discussion of Plaintiff's headaches is not at issue.  According to

7   Plaintiff:

8            The ALJ rejected Plaintiff's testimony regarding his headaches
         largely because of Plaintiff's failure to seek more aggressive treatment
9         (Tr. 20).  Plaintiff will not address this finding because he has not raised
         the issue of the ALJ's assessment of his headaches.
10

11   ECF No. 17, pg. 17 n.9.

12            As discussed above, the Court finds no error in the ALJ's disregard of a one-time

13   GAF score of 45.  As also discussed above, the Court finds no error in the ALJ's analysis of the

14   medical opinion evidence offered by Dr. Izzi and Plaintiff does not challenge the ALJ's analysis

15   as to Dr. Fabella.  Plaintiff also does not challenge the ALJ's evaluation of the opinions offered

16   by the various consultative reviewing doctors.

17            Remaining, then, is Plaintiff's contention that the ALJ's credibility finding is

18   based on a flawed interpretation of the objective evidence related to Plaintiff's left eye and mental

19   impairments.  Plaintiff appears to incorporate his discussion of the objective evidence in the

20   context of his challenge to the ALJ's analysis of the opinion evidence into this portion of his

21   brief.

22                    a.       Interpretation of Objective Evidence Relating to Plaintiff's
                               Left Eye
23

24            In the context of the opinion evidence, Plaintiff describes the objective evidence as

25   indicating the following relating to his left eye: (1) Plaintiff's left eye was knocked out of its

26   socket when he was hit by a car at age two; (2) he underwent eye surgery, but the left eye

27   remained laterally deviated; (3) Plaintiff's right eye visual acuity uncorrected is 20/40; (4)

28   Plaintiff's left eye visual acuity uncorrected is 20/200; (5) Plaintiff's right eye visual acuity

20

1   corrected is 20/30; (6) Plaintiff's left eye visual acuity cannot be corrected; (7) Plaintiff's left eye

2   visual field is constricted to 30 to 40 degrees; and (8) Plaintiff has left eye exotropia. See id. at

3   12.

4           Plaintiff appears to contend the ALJ's "interpretation" of this evidence is flawed

5   because the ALJ substituted his own lay medical conclusions for those of medical professionals.

6   See ECF No. 17, pg. 13 (Plaintiff's discussion of evidence relating to visual impairment).  The

7   Court does not agree.  First, in discussing Plaintiff's left eye limitation, the ALJ accurately recited

8   the objective evidence outlined by Plaintiff.  See CAR 19 (summary of objective findings).

9   Second, as discussed above in this opinion, the Court concludes that the ALJ's analysis of

10  Plaintiff's left eye impairment and resulting work-related limitations is sound.  Specifically,

11  Plaintiff has failed to provide objective evidence of greater functional limitations than those

12  opined by Drs. Hasnain and Fabella.  Third, the Court does not find that the ALJ substituted her

13  lay opinion for an opinion of a medical professional.  To the contrary, the ALJ accepted the

14  interpretations of the evidence as expressed by Drs. Hasnain and Fabella.

15              b.      Interpretation of Objective Evidence Relating to Plaintiff's
                        Mental Impairment
16

17          As to the objective evidence relating to Plaintiff's mental impairment, Plaintiff

18  does not challenge the ALJ's interpretation of such evidence.  Rather, Plaintiff contends the ALJ

19  failed to account for a specific limitation opined by Dr. Izzi and that the ALJ failed to account for

20  a GAF score of 45 assessed by a treating source.  See ECF No. 17, pgs. 14-16.  For the reasons

21  discussed above, the Court finds no errors in either regard.  Plaintiff has not otherwise explained

22  how the ALJ's interpretation of the evidence is flawed.

23              2.      Lack of Objective Evidence

24          In challenging the ALJ's adverse credibility finding, Plaintiff argues in a single

25  sentence: "[A]n ALJ's rejecting of a claimant's subjective complaints will not survive judicial

26  review if such rejection is based only on lack of support in his medical records."  ECF No. 17, pg.

27  17 (emphasis added).  Plaintiff does not specifically contend that the ALJ in this case did so, nor

28  can he.  It is clear from the hearing decision that the ALJ's credibility finding is based on

1    inconsistency with the objective evidence <u>as well as</u> inconsistency with Plaintiff's daily activities

2    (discussed below).  <u>See</u> CAR 19-20.  Because the ALJ did not rely solely on inconsistency with

3    the objective evidence, the Court rejects this argument.

4                        3.      <u>Reliance on Daily Activities</u>

5                    Plaintiff's primary contention is that the ALJ improperly relied on daily activities

6    to find his statements and testimony not credible.  <u>See</u> ECF No. 17, pg. 17-19.  The Court does

7    not agree.  Here, the ALJ noted Plaintiff lives alone, works part-time, manages his own finances,

8    gardens, does yard work, plays poker, and tends to his own personal needs.  <u>See</u> CAR 19-20.

9    According to Plaintiff, the ALJ erred because the evidence shows that Plaintiff was a recluse who

10   rarely left home and he only worked part-time, which he found to be a struggle.  Plaintiff does not

11   address his ability to manage finances, cook, garden, do yard work, and tend to personal needs on

12   his own.  Further undermining Plaintiff's credibility is evidence that Plaintiff was able to engage

13   in substantial gainful activity for many years as an adult despite claiming to be disabled as a result

14   of his left eye impairment caused by a childhood injury.

15                   On the whole, the Court agrees with the ALJ that Plaintiff's daily activities show

16   more functional capacity than alleged by Plaintiff and, as such, constitute substantial evidence

17   supporting an adverse credibility finding.

18

19          **C.      <u>Lay Witness Evidence</u>**

20                   Plaintiff argues the ALJ failed to adequately consider lay witness evidence offered

21   by his mother, Judith Wofford.  <u>See</u> ECF No. 17, pg. 19.

22                   In determining whether a claimant is disabled, an ALJ generally must consider lay

23   witness testimony concerning a claimant's ability to work.  <u>See</u> <u>Dodrill v. Shalala</u>, 12 F.3d 915,

24   919 (9th Cir. 1993); 20 C.F.R. §§ 404.1513(d)(4) & (e), 416.913(d)(4) & (e).  Indeed, "lay

25   testimony as to a claimant's symptoms or how an impairment affects ability to work is competent

26   evidence . . . and therefore cannot be disregarded without comment."  <u>See</u> <u>Nguyen v. Chater</u>, 100

27   F.3d 1462, 1467 (9th Cir. 1996).  Consequently, "[i]f the ALJ wishes to discount the testimony of

28   lay witnesses, he must give reasons that are germane to each witness."  <u>Dodrill</u>, 12 F.3d at 919.

1    When rejecting third party statements which are similar in nature to the statements of plaintiff, the

2    ALJ may cite the same reasons used by the ALJ in rejecting the plaintiff's statement.  See

3    Valentine v. Commissioner Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) (approving

4    rejection of a third-party family member's testimony, which was similar to the claimant's, for the

5    same reasons given for rejection of the claimant's complaints).

6            Concerning lay witness evidence offered in this case, the ALJ stated:

7            Under the mandate of Social Security Ruling 06-03p, the undersigned has
             considered the third-party function reports completed by the claimant's
8            mother, Judith Wofford, in May 2015.  In her reports, Ms. Wofford
             indicated that the claimant is very anxious, angry, depressed, and
9            paranoid.  She observed that the claimant experiences hallucinations,
             vision issues, and "grave" social disassociation.  However, Ms. Wofford
10           further reported that despite these impairments, the claimant retains the
             ability to tend to his own personal needs, perform household chores, ride a
11           bike, use public transportation, shop for groceries, and attend his doctor
             appointments (Exhibits 6E, 8E).  As such, the undersigned has considered
12           Ms. Wofford's statements, but finds that they do not warrant a
             modification to the above-determined residual functional capacity in any
13           way.

14           CAR 22.

15           According to Plaintiff:

16           The ALJ found that the statement of Plaintiff's mother, Judith
             Wofford, did not warrant a modification of the RFC finding "in any way"
17           (Tr. 22). This is error.

18           Mrs. Wofford's statement describes an individual who is reclusive
             and isolated. Plaintiff spent no time with other people, did not socialize
19           and was estranged from his family (other than his parents) (Tr. 267-68).
             He left home only to go to doctors appointments and to the store (Tr. 267).
20           He handled stress very poorly and became agitated (Tr. 269). His activities
             consisted of taking a shower twice a day, assisting with yard work, doing
21           his laundry, cleaning his trailer and microwaving meals, but he needed
             reminding to do his chores (Tr. 264-65). He was unable to concentrate on
22           tasks, follow simple orders or balance a bank account (Tr. 266-67). He
             could pay attention for 10 minutes, followed written instructions poorly
23           and required a lengthy explanation to follow spoken instructions (Tr. 268).
             He handled changes in routine poorly (Tr. 269).

24                          *  *  *

25
             Although the ALJ did not explicitly reject Mrs. Wofford's
26           statement, the ALJ's description of her statement is inaccurate and
             incomplete (Tr. 22). See Bruce v. Astrue, 557 F.3d 1113, 1116 (9th Cir.
27           2009) (ALJ credited wife's testimony as to claimant's daily activities, but
             failed to accept or properly reject wife's testimony that claimant's

28

                                                23

1     activities were limited). Further, the ALJ gave no reasons for rejecting
      Mrs. Wofford's observations of Plaintiff's impaired abilities to
2     concentrate, remember and deal with stress (Tr. 22). Mrs. Wofford's
      statement cannot be so easily disposed of. See Dodrill, 12 F.3d at 918-19
3     (the testimony of witnesses who clearly saw claimant on a frequent basis
      cannot be easily disposed of).
4            Mrs. Wofford's statement indicates Plaintiff could function only
      when he isolated himself at home and even then he had problems with
5     concentrating and remembering simple tasks, such as chores and
      appointments. The ALJ should not have given such short shrift to this
6     significant, probative evidence. The ALJ's failure to adequately assess
      Mrs. Wofford's statement is legal error and is yet another reason for
7     remanding this case. Tobeler, 749 F.3d at 832-33.

8            ECF No. 17, pgs. 19-20.

9            Plaintiff challenges the ALJ's assessment, concluding that the ALJ failed to

10    "explicitly reject" Plaintiff's mother's statements.  The Court disagrees.  The ALJ found that Ms.

11    Wofford's statements did not warrant an alteration of the residual functional capacity finding.

12    This, by any fair reading of the ALJ's decision, constitutes a rejection of Ms. Wofford's

13    testimony.  Additionally, the Court finds that, in rejecting Ms. Wofford's statements, the ALJ

14    gave reasons germane to the witness.  Specifically, the ALJ cited the same reasons as cited for

15    rejecting Plaintiff's own statements and testimony as not credible – largely functional daily

16    activities.  The Court finds no error in the ALJ's analysis of lay witness evidence.  See Valentine,

17    574 F.3d at 694.

18

19                                   **IV.  CONCLUSION**

20           Based on the foregoing, the undersigned recommends that:

21           1.      Plaintiff's motion for summary judgment, ECF No. 17, be denied;

22           2.      Defendant's cross-motion for summary judgment, ECF No. 18, be granted;

23    and

24    / / /

25    / / /

26    / / /

27    / / /

28    / / /

                                          24

1          3.      The Commissioner's final decision be affirmed.

2                  These findings and recommendations are submitted to the United States District

3  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 14 days

4  after being served with these findings and recommendations, any party may file written

5  objections with the court.  Responses to objections shall be filed within 14 days after service of

6  objections.  Failure to file objections within the specified time may waive the right to appeal.  See

7  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

8

9  Dated:  February 26, 2021

10                                              _____
                                                DENNIS M. COTA
11                                              UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28